CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 10 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

SHAKA ZULU ACOOLLA,         )
a.k.a. THOMAS JACKSON,      )
      Plaintiff,           )     **Civil Action No. 7:01-cv-01008**
                          )
v.                     )     **MEMORANDUM OPINION**
                          )
RON ANGELONE, et al.,       )     **By: Hon. James C. Turk**
      Defendants.         )     **Senior United States District Judge**

       Plaintiff Shaka Zulu Acoolla, a.k.a. Thomas Jackson, #238550, a Virginia Department of

Corrections ("VDOC") inmate proceeding pro se, brings this action under the Civil Rights Act,

42 U.S.C. §1983, with jurisdiction vested under 28 U.S.C. §1343. Of the many claims raised in

his original complaint,[1] only the following claims remain before the court: a) enforcement of the

VDOC's grooming policy, Departmental Operating Procedure 864 ("DOP 864"), placed

continuing and substantial burdens on Acoolla's religious practices in violation of the Religious

Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et. seq.; b)

defendants' actions in coercing Acoolla to remove beads from his dreadlocks in August 2000

---

      [1]After the court dismissed some of Acoolla's claims, pursuant to 28 U.S.C. § 1915A, in December 2002, defendants filed a motion for summary judgment, and Acoolla responded. Because defendants challenged the constitutionality of RLUIPA as applied to state prisons, the United States intervened to defend the statute. On June 4, 2003, the court stayed the action, pending resolution of an appeal on similar issues that was then pending. See Madison v. Riter, 240 F. Supp. 2d 566 (W.D. Va. Jan. 23, 2003), rev'd 355 F.3d 310 (4th Cir. Dec. 8, 2003), cert. denied, 125 S. Ct. 2536 (March 30, 2005). The court maintained the stay during a subsequent petition for a writ of certiorari in the Madison case and dismissed the pending motion for summary judgment without prejudice. After the Supreme Court decided Cutter v. Wilkinson, 125 S. Ct. 2113 (2005), holding that RLUIPA does not violate the Establishment Clause, the high court also denied certiorari in Madison. The court then reinstated Acoolla's case to the active docket and granted defendants an opportunity to file dispositive motions on the merits of his religious rights claims. Defendants filed a motion, memorandum, affidavits and exhibits. They also incorporated by reference all the arguments and exhibits from their previously filed motion for summary judgment.

1

violated his religious rights; c) defendants' refusal to allow Acoolla to possess a bottle of prayer oil in his segregation cell violates his rights under RLUIPA and the First Amendment; and d) defendants' refusal to provide Acoolla with a diet in keeping with his religious beliefs violates his rights under RLUIPA and the First Amendment. Defendants filed a motion for summary judgment asserting that Acoolla has no claim under RLUIPA or the Constitution. Acoolla responded to defendants' motion and filed his own motion for summary judgment. Upon review of the record, the court concludes that defendants' motion for summary judgment must be granted in part and denied in part, and plaintiff's motion for summary judgment must be denied.

## I. Background

Acoolla states that he is a Rastafarian of the Nyahibinghi order, the most ancient order among numerous sects of Rastafarian believers. These sects share some of the same religious tenets, but each sect has also developed other, unique beliefs. Acoolla states that his religious beliefs require him to keep his hair and beard uncut; wear religious beads in his hair; eat a strict vegetarian ( "vegan") diet that is also kosher;[2] use prayer oil; and participate in group worship on his weekly Sabbath day (Saturday) in a ceremony that includes the use of drums, chanting, readings, and religious conversations known as "reasoning." Acoolla claims, "Unity is a must for Rastafarians."

### A. Grooming Policy

On December 15, 1999, the VDOC began enforcing DOP 864, setting forth new personal grooming standards for all inmates incarcerated in VDOC facilities. The policy covers hair care, hair style, beards, mustaches, fingernails and general hygiene. Defendants assert that this

---

[2]Acoolla explains the word "kosher" as meaning "pure, natural, or clean."

2

grooming policy was designed to promote safety, security, and sanitation, and to facilitate the identification of inmates. DOP 864 directs that male inmates must keep their hair no more than one inch in depth and thickness. Male inmates may not wear beards, goatees, or sideburns below the middle of the ear unless they obtain an order from medical staff exempting them from shaving. Men who get a no-shave order for medical reasons must keep their facial hair trimmed to one eighth of an inch in length or shorter. DOP 864 prohibits male inmates from wearing certain hair styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, designs cut into the hair, or any style which could conceal contraband.

Inmates who refuse to cut their hair, beards, and/or fingernails, or to alter their hair styles to comply with the specifications of this procedure will be given an order to do so. If an inmate continues to refuse to comply, he will be charged with a disciplinary code violation and be placed on pre-hearing detention. If convicted of the charge, that inmate will serve an isolation sentence. If he is convicted of two more such violations, he will serve two additional, longer isolation sentences and then be referred to the Institutional Classification Authority for assignment to segregation, possible reclassification to a higher security level institution, and a possible reduction in the rate at which he can earn good time or earned sentence credit. The inmate will remain assigned to segregation until he fully complies with the grooming standards.

Defendants submit the affidavit of VDOC Director Gene Johnson, who describes in detail the penological interests DOP 864 was designed to alleviate: security, staff safety, inmate identification, and inmate health. Johnson presents descriptions of numerous instances where inmates' long hair or beards have caused these specific types of security problems at VDOC prisons in the past. As a prison administrator with nearly forty years of experience, Johnson

3

also offers his professional opinion regarding the manner in which the policy addresses each of these interests, the necessity of uniform enforcement of the policy in the general population, and the specific reasons that make the alternatives suggested by Acoolla unworkable in the VDOC system. Defendants' evidence indicates that the penalty aspects of DOP 864 have changed somewhat since the policy's inception in 1999. See Def. MSJ, Dkt. #48, Exh. IV, Encl. A (DOP 864, 11-15-1999); Def. MSJ, Dkt. #90, Attach. 1, Encl. A (DOP 864, 7-1-2003). For example, the 1999 policy dictated that noncompliant inmates would have all visitation, telephone (except legal), and commissary privileges suspended while in noncompliance. These restrictions are omitted from the 2003 policy. Now, inmates who do not comply with DOP 864 for religious reasons are simply subject to the same restricted privileges and property limitations as are all segregation inmates at the institution where they are housed.

Since 1985, Acoolla has been in and out of the VDOC several times. It is undisputed that in all that time, he has worn dreadlocks and has never caused any security or sanitation problem with his hair. He was at Buckingham Correctional Center ("BKCC")[3] when VDOC officials began enforcing DOP 864 there on December 16, 1999. Because Acoolla refused to cut his hair and beard in compliance with DOP 864, he suffered the following effects and penalties during the period from December 1999 to November 2001: more than twenty disciplinary charges for noncompliance, which resulted in his serving a total of 100 days of isolation time; administrative segregation (confinement in his cell for 23 of every 24 hours with minimal personal property);[4]

_____

[3]BKCC is a Level III security institution on a scale where Level VI is the most secure.

[4]In January 2001, officials transferred Acoolla to Bland Correctional Center ("BCC"), a Level II security institution, and assigned him to the Special Management Building ("SMB"). In the SMB, officials housed inmates noncompliant with DOP 864, using the same level of restraints

4

increase in security level; reduction in good time earning ability;[5] loss of prison employment, exclusion from educational and rehabilitational programming, including the ability to attend group religious services; loss of visitation, commissary, and telephone privileges (except legal); and ineligibility for reclassification to a lower security level or different housing assignment until he complies with DOP 864. When he was housed in the general population before implementation of the policy, Acoolla retained his long hair and beard, his religious hair beads, his prayer oil, and the chance to congregate regularly with other Rastafarian believers for religious services. Acoolla seeks monetary damages for past violations of his rights and injunctive relief from the restrictions of the grooming policy, as he remains in segregation to this day as a result of his continued noncompliance with DOP 864.

## B. Religious Hair Beads

Acoolla arrived at Augusta Correctional Center ("ACC"), a Level IV security institution, on August 1, 2000. He had beads in the Ethiopian/African colors of red, green, gold, and black, threaded through his dreadlocks; the beads could only be removed by cutting the hair that had matted around them. Officials told Acoolla that he would have to cut his dreadlocks and beard in

---

as used for Level VI inmates. They also placed Acoolla under isolation-like conditions–kept in his cell at all times except for three, one-hour recreation periods and two ten-minute showers per week and restricted from possessing numerous property items (including newspapers) otherwise authorized for administrative segregation inmates. In March 2001, officials assigned Acoolla to a double cell with another inmate serving isolation time. In July 2001, they transferred Acoolla back to BKCC, where he was double celled under the same isolation-like conditions. When he complained, officials told him that if he cut his hair, he would no longer be subject to the challenged restrictions.

[5]In August 1999, officials reclassified Acoolla to Level I, earning the highest possible amount of good time credit against his term of confinement. In November 1999, his anticipated release date was October 12, 2005. By March 2001, as a result of his noncompliance with DOP 864, his anticipated release date was March 20, 2009.

compliance with DOP 864 or he would be placed in segregation. They also told him that the beads in his hair were contraband in the segregation unit and he would have to remove them.[6] Acoolla alleges that Major Redman told him that he would be placed in four-point restraints if he did not get the beads out of his hair.[7] Acoolla did not cut his hair or remove the beads as directed. Officials transported him to segregation at that point anyway. Once in his cell, Acoolla cut the beads out of his hair. At no time during this incident did officers place him in four-point restraints. Acoolla asserts that using the threat of restraints in order to pressure him into cutting his hair in offense to his religious beliefs was a violation of his rights under the First Amendment and RLUIPA.

## C. Prayer Oil

Acoolla complains that he cannot have a bottle of prayer oil in his cell while in segregation. He states that his religious beliefs require him to annoint his head and hands with such oil while praying. The authorized property list for general population inmates does allow such inmates to possess a one ounce plastic container of prayer oil purchased from the commissary. DOP 856 (dated September 1, 2001), Att. 3C. The authorized property list for segregation inmates omits prayer oil. Id. No inmate is allowed to possess baby oil. Major

---

[6]Redman remembers that Acoolla became belligerent when staff told him to remove the beads and refused to put on the orange jumpsuit that all inmates must wear when assigned to the special housing unit; Redman states that he told Acoolla to stop his disruptive behavior or he would be placed in four-point restraints. Redman Affid., Dkt. #50. Redman explains that the beads, which appeared to be homemade, were contraband because they were not on the list of authorized property for segregation inmates to possess in their cells in accordance with DOP 856, Att. 3C. This list authorizes segregation inmates to possess a religious necklace; it does not authorize religious hair beads.

[7]It is undisputed that the grooming policy does not authorize inmates to be placed in four-point restraints as punishment for failing to comply with the policy's requirements.

6

Redman explains that segregation inmates have abused baby oil and similar products in the past, by making their bodies slippery with oil to make it more difficult for staff to hold them or by slicking down the floor with oil to make staff lose their footing when entering the cell. Redman Affid., Dkt. #50.

Records indicate that Acoolla first complained in October 2001 at BKCC that because of his noncompliance with DOP 864, he was not allowed to order prayer oil from the commissary.

### D. Religious Diet

Acoolla first informed prison officials of his Rastafarian dietary needs in July 2000, when he was housed at BKCC. He asked to have his meals served on aluminum trays like the Islamic inmates received. The food service manager explained that the plastic, generally used food trays were sanitized between uses and that the VDOC did not "recognize this religious/diet." Acoolla then applied to receive the Common Fare diet. He explained to officials that his Rastafarian beliefs required him to avoid death by avoiding all meat or animal by-products or utensils that had been used to prepare such foods. He told officials that the Common Fare menu came the closest of any VDOC-approved diet to meeting his religious needs because it required all foods to be prepared and served using disposable plates and utensils unless such items were washed and stored separately from any item used to prepare meat. The BKCC committee approved his request for the Common Fare diet on July 27, 2000. Four days later Acoolla was transferred to Augusta Correctional Center ("ACC"). On August 8, 2000, VDOC Central Classification Services ("CCS") in Richmond disapproved Acoolla's request to receive the Common Fare diet, stating that there were "no compelling religious reasons for [him] to participate in the diet" and he could "select alternative entree selections from the regular food line to satisfy his dietary

7

desires." In mid-2001, Acoolla made another request for the Common Fare diet. BKCC officials approved him for the diet in September 2001, but CSS overturned this result in November 2001, finding that Acoolla's religious affiliation did not require the Common Fare diet and he could request vegetarian entrees.

VDOC Food Services Director Linda Shear, a registered nurse and dietician, states that a strict vegetarian or "vegan" diet consisting only of vegetables, fruits and grains leaves participants with nutritional deficiencies in protein, vitamin B12, vitamin D, iron, vitamin C, riboflavin, and zinc. Strict vegetarians address these nutritional problems by consuming fortified milk, seaweed, or fermented soy, none of which is currently purchased by the VDOC. These dietary deficiencies can cause serious health problems such as rickets, scurvy, and other conditions associated with malnutrition.

Ms. Shear states that inmates at all VDOC facilities may consume a vegetarian diet by eating from the regular serving line and selecting the meatless alternatives provided for each meal--cheese or peanut butter at breakfast and beans for lunch and dinner. This vegetarian diet is not kosher, but it is nutritionally adequate. The Common Fare Diet was designed to meet the dietary needs of inmates whose religious beliefs require a kosher, non-pork diet and cannot be met by eating from the regular serving line. Common Fare is not a vegetarian diet. It includes meat and fish items for which the diet does not provide nonmeat alternatives. An inmate who consumed the Common Fare Diet without eating the meat items would not receive a nutritionally adequate diet.

Defendants also assert that Rastafarians do not require a kosher, vegan diet and, therefore, Acoolla does not require the diet. In February 2004, Defendant Cei spoke with

Rastafarian leaders in Washington, D.C. These clerics told him that the vegetarian meal options available in VDOC prisons fulfill the dietary needs of Rastafarian believers.

## II. Analysis

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Fed. R. Civ. P. 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). The moving party is not entitled to summary judgment, however, if the parties' dispute over a material fact is "genuine." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Id. In response to a motion for summary judgment, properly supported by affidavits, the nonmovant may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). He "must identify affirmative evidence from which a jury could find" in his favor. Anderson, 477 U.S. at 256-57. Summary judgment appropriately lies for the movant only if there can be but one reasonable conclusion drawn from the evidence, against the non-moving party. Id. at 247-48.

9

## A. Religious Rights Legal Standards

### 1. First Amendment Standard

For purposes of their motion for summary judgment, the defendants do not dispute that Acoolla has sincere religious beliefs requiring him to keep his hair and beard uncut, to wear religious beads in his hair, to use prayer oil, and eat a kosher, vegan diet. An inmate's right to practice his religious beliefs is not absolute, however, under the First Amendment or RLUIPA.

To state a cause of action under §1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). Inmates clearly retain protections under the First Amendment, including the right to free exercise of religious beliefs. Cruz v. Beto, 405 U.S. 817, 822 (1977). A sincere, but personal religious belief warrants this constitutional protection, regardless of whether the belief is mandated by a particular, established religion or held by a majority of the believers within a religion. Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 716 (1981) (finding that federal courts are not to sit as arbiters of religious orthodoxy); United States v. Seeger, 380 U.S. 163, 185 (1965) (finding that inmate's religious exercise is entitled to constitutional protection if his beliefs are "sincerely held and . . . in [his] own scheme of things, religious"); Dettmer v. Landon, 799 F.2d 929, 931-32 (4th Cir. 1986) (same).

The principle that inmates retain at least some constitutional rights must be weighed against the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration. Washington v. Harper, 494 U.S. 210 (1990). Accordingly, there need be only a rational connection between a prison policy and a legitimate governmental

interest put forward to justify it. <u>Turner v. Safley</u>, 482 U.S. 78 (1987); <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342 (1987). Otherwise, courts must leave judgment calls on prison policy to the expertise of prison officials. <u>See</u> <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979); <u>Block v. Rutherford</u>, 468 U.S. 576 (1984)(courts cannot substitute their own judgment on institutional management for that of prison officials). <u>Turner</u> requires the court to consider four factors: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (c) whether the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty and on the allocation of limited prison resources; and (d) whether the regulation represents an "exaggerated response" to prison concerns. <u>Id.</u> at 89-91. The existence of an alternative which could fully accommodate the prisoner's rights at <u>de</u> <u>minimis</u> costs to valid penological interests is evidence that the regulation is an unreasonable, and therefore, unconstitutional restriction. <u>Id.</u> at 90-91.

## 2. RLUIPA Standard

Section 3 of RLUIPA prohibits governments from enacting regulations, including rules of general applicability, or otherwise taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." § 2000cc-1(a)(1)-(2). This "strict scrutiny" standard applies any time such a burden on religious exercise occurs "in a program or activity that receives Federal financial assistance," or "affects, or removal of that substantial burden would affect," interstate

11

or foreign commerce.[8] Id. The statute creates a private cause of action for persons who allege that a government has substantially burdened their religious conduct. § 2000cc-2(a). The statute defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A). Once the plaintiff demonstrates that the challenged law places a substantial burden on his exercise of sincere religious beliefs, the government must prove that the imposition of the burden furthers a compelling interest by the least restrictive means. § 2000cc-2(b).

Congress clearly expressed its intention that courts applying the RLUIPA standard in the prison context should give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter v. Wilkinson, 125 S. Ct. 2113, 2123 (2005) (citations to congressional records omitted). Affidavits or testimony from experienced prison officials, describing and explaining compelling penological interests in detail and predicting in specific terms the unworkability of less restrictive alternatives, can provide sufficient evidence that a regulation meets the RLUIPA standard. Ragland v. Angelone, ___ F. Supp. 2d ___, No. 7:02-cv-00786, 2006 WL 679773, at *6, *12 (W.D. Va. March 14 and 16, 2006),[9] citing Brown v. Payton, 437 F.2d 1228, 1231-32 (1971) (holding that inmate's "desire to practice his religion may be restricted only upon a

---

[8]In their current motion, defendants do not argue that they are not subject to RLUIPA, although they reserve their arguments that RLUIPA is unconstitutional as applied to state prisons.

[9]The day after issuing the initial memorandum opinion in Ragland, the court issued a supplemental memorandum opinion discussing additional precedent from the United States Court of Appeals for the Fourth Circuit. That supplement is part of the court's published opinion in the case.

12

convincing showing that paramount state interests so require" and prison officials could not meet this burden without offering more than conclusory contradictions); Hoevenaar v. Lazaroff, 422 F.3d 366, 370-71 (6th Cir. 2005) (upholding prison grooming policy under RLUIPA based on deference to prison officials' judgment). In the face of such expert opinion evidence, a reviewing court generally need not also require prison officials to produce data proving the validity of their opinions to a certainty. Ragland, 2006 WL 679773, at *6.

## 3. Qualified Immunity

State officials receive qualified immunity against suits for damages if a reasonable officer facing the same situation would not have known that his actions violated plaintiff's clearly established constitutional or statutory rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A right is clearly established when the Supreme Court, the appropriate court of appeals, or the highest court of the state has addressed the issue. Wilson v. Lane, 141 F.3d 111, 114 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999). On the other hand, qualified immunity applies if an official's challenged conduct was objectively reasonable in light of legal rules that were in force at the time of his actions. See, e.g., Saucier v. Katz, 533 U.S. 194, 201-02 (2001).

## B. RLUIPA Claims Regarding the Grooming Policy

The court recently held that enforcement of the current DOP 864 grooming policy provisions against an inmate who keeps his hair uncut in keeping with his religious beliefs did not violate that inmate's rights under RLUIPA.[10] Ragland, 2006 WL 679773, at *10. Like

---

[10] As stated, in a previous opinion and order, the court dismissed Acoolla's First Amendment challenges to the VDOC grooming policy. See DeBlasio v. Johnson, 128 F. Supp. 2d 315 (E.D. Va. 2000), aff'd 00-6999, 00-7707, 00-7705, 00-7708, 00-7706, 00-7700, 2001 WL 721398 (4th Cir. 2001); Ashann-Ra v. Commonwealth of Virginia, 112 F.Supp.2d 559 (W. D. Va. 2000).

13

Acoolla, Plaintiff Ragland is housed in segregation because he continues to refuse to comply with DOP 864. The defendant prison officials did not contest the sincerity of Ragland's religious beliefs that required him not to cut his hair, nor did they contest his assertion that enforcement of DOP 864 against him placed substantial burdens upon his practice of this belief and that he thus stated a prima facie claim under RLUIPA. Id. at *5. In support of the policy, defendants in Ragland offered an affidavit from Gene Johnson, very similar to the affidavits of John Jabe and Gene Johnson offered in this case. Noting the court's continuing obligation under RLUIPA to defer appropriately to the expert opinions of experienced prison administrators in prison policy matters, the court first found that defendants had established that compelling state interests in security, staff safety, inmate identification, and inmate health are furthered by the grooming policy. Id. at *6. The court also found that defendants had established a compelling interest in uniform enforcement of the grooming policy in the general population and in segregating all noncompliant inmates. Id. at *7-8. Again deferring to Johnson's expertise, the court then held that defendants had established that creating any religious exemption to segregation restrictions for such inmates would present unacceptable, additional security risks. Id. at *8-9. Thus, the court found that DOP 864 in its current form furthers compelling interests by the least restrictive means and that defendants were entitled to summary judgment as a matter of law as to Ragland's claims under RLUIPA. Id.

In addition, the court found that defendants were entitled to qualified immunity against any claims for monetary damages for the alleged violations of RLUIPA. Id. at *4, citing Jackson v. District of Columbia, 89 F. Supp. 2d 48, 65-69 (D. D.C. 2000), vacated on other grounds, 254 F.3d 262 (D.C. Cir. 2001). See also Hines v. South Carolina Dep't of Corrections, 148 F.3d 353,

14

357 (4th Cir. 1998) (noting that district court had upheld prison grooming policy under the First Amendment as well as the strict scrutiny standard of RFRA). Because district courts in D.C. and South Carolina had found that a grooming policy like the VDOC's policy furthered compelling interests by the least restrictive means, VDOC officials reasonably could have believed that their conduct in enforcing the policy did not violate inmates' rights under the compelling interest test of RLUIPA. See Hope v. Pelzer, 536 U.S. 730, 739 (2002) (finding that qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful).

In their current motion, defendants do not contest Acoolla's assertions that enforcement of the grooming policy places a substantial burden on his religious exercise and that he thus states a prima facie case under RLUIPA. For the reasons stated in the Ragland opinions, however, the court concludes that DOP 864 meets RLUIPA's strict scrutiny standard and that defendants in this case are entitled to summary judgment as to all of Acoolla's grooming policy claims save one. As the court found in Ragland, prison officials have offered sufficient evidence that segregation of inmates who refuse to cut their hair, like Acoolla, is the least restrictive way to control the compelling risks that hair presents. The alternatives and exemptions that plaintiff suggests, or highly similar ones, the court addressed in the Ragland case. In this case, as in Ragland, the court must defer to defendants' specific expert opinion that the offered alternatives would not control the compelling risks defendants have identified.[11]

_____

[11]Acoolla asserts that he is entitled to judgment on the ground of res judicata or collateral estoppel, based on the holding in Gatrell v. Ashcroft, 191 F. Supp. 2d 23 (D.D.C. 2002). The issues litigated in Gatrell were specific to District of Columbia (D.C.) inmates in the custody of the United States Bureau of Prisons ("BOP") and housed in VDOC prisons under intergovernmental contracts. Id. at 26-27. The Gatrell court found that as a less restrictive alternative, the BOP could easily have

15

Acoolla complains that segregation status prevents him from congregating with fellow believers, an important aspect of his religious practice. Defendants' evidence indicates that allowing such gatherings of segregation inmates with long hair would present the same risks as existed before the grooming policy—that inmates would hide contraband in their hair, pass it to each other during the meeting or use it to injure staff or other inmates, or that inmates in close contact with each other might spread parasites or other hair-related health problems.[12] The fact that plaintiff and others of his faith have never used their hair to violate other prison policies does not eliminate the risks presented by their hair itself that such problems might occur in the

placed plaintiffs at one of many institutions in the nation-wide BOP prison system that did not have a grooming policy requiring plaintiffs to cut their hair. Id. at 38. The facts of the Gatrell case are clearly distinguishable from the facts of Acoolla's case. Today, the VDOC grooming policy allows Acoolla to wear his hair and beard uncut in keeping with his religious beliefs. The plaintiffs in Gatrell would not have had this option if they had returned to a VDOC prison in 2002. Id. at 37-38. Moreover, defendants have provided evidence that the VDOC transfer system differs dramatically from the BOP system. While the BOP may simply choose to transfer inmates within its own prison system to institutions with no hair cutting requirement, the VDOC would have to find another jurisdiction's prison system that has no hair cutting regulation and that also wishes to trade the right number of inmates of similar security level at the right time. To participate in this barter/transfer scheme, VDOC inmates generally must meet specific criteria and wait for their names to reach the top of a waiting list for such transfers. Putting religious exemptions above nonreligious transfer requests would be unfair, would create resentment, and would foster copycat transfer claims from inmates who would "find" religion in order to make an end run around the ordinary VDOC transfer system. As the court found in Ragland, the transfer option is not a reasonable alternative within the VDOC system. 2006 WL 679773 at *8.

Acoolla also cites Gallahan v. Hollyfield, 516 F. Supp. 1004 (E.D. Va. 1981), aff'd, 670 F.2d 1345 (4th Cir. 1982). The court distinguished this opinion in its supplemental opinion in Ragland, and it clearly does not provide Acoolla with grounds for relief here. 2006 WL 679773 at *11-13.

[12]Acoolla mentions a VDOC protective custody unit, where inmates with enemies who cannot safely be housed within the general population at any VDOC prison are housed in a separate unit under general population restrictions and privileges. Even assuming that such a unit still exists within the VDOC, a similar alternative for inmates noncompliant with DOP 864, where they could mingle at will with each other in common areas, would not address the security and sanitation concerns that motivated the policy in the first place.

16

future.  Other inmates in the segregation unit may be equally eager to congregate with others for nonreligious reasons and would undoubtedly resent a religious exemption, leading to heightened risks of retaliation, violence, or pretended religious needs to congregate.  Indeed, as the court found in Ragland, allowing a religious exemption from any of the challenged segregation restrictions would potentially have these effects and thus create new security risks.  Id. at *8-9.

With the requisite level of deference to officials' expertise in policy matters, for the reasons stated in Ragland and in this opinion, the court concludes that defendants are entitled to summary judgment as a matter of law as to plaintiff's claims for injunctive relief regarding the enforcement of the current VDOC grooming policy as it affects his segregation housing status and his rights and privileges within that status.  As defendants are entitled to judgment, plaintiff's motion for summary judgment is denied as to these claims.

Furthermore, the court concludes that defendants are entitled to summary judgment on the ground of qualified immunity as to plaintiff's claims for monetary damages regarding these matters.  Defendants' qualified immunity also extends to Acoolla's claims for damages arising from the harsher restrictions imposed under earlier versions of the grooming policy.  Id. at *4. Because courts in Hines and Jackson had found the policy to be justifiable under the least restrictive means test of RFRA, defendants reasonably believed that enforcing the policy as it was then written did not violate inmates' rights under the same provision in RLUIPA.

Acoolla also alleges that defendants punished him for his noncompliance with the grooming policy in ways not authorized by the policy itself.  He alleges that he received nineteen disciplinary charges for noncompliance with, or disobeying a direct order to comply with, DOP 864 and as a result, served 100 days in isolation, without any out-of-cell recreation and with

17

extreme limitations on his personal property as a result of these extra charges.[13]  He also alleges

that officials celled him with another inmate for several months, although both inmates were kept

in the cell nearly constantly, and that officials confiscated many personal property items that

other segregation inmates were allowed to possess, including newspapers.

The court finds that defendants are entitled to qualified immunity as to Acoolla's claims

for damages arising from these additional punishments.  Pursuant to the version of the policy in

force from November 1999 until mid-2003, Acoolla was already in segregation under severe

restrictions on his property and his out-of-cell recreation (three hours per week, weather

permitting).  As stated, defendants could reasonably have understood that these restrictions were

acceptable under RLUIPA in light of the Jackson and Hines decisions.  Likewise, defendants

could reasonably have believed that the extra-policy measures of which Acoolla complains were

equally acceptable extensions or interpretations of the policy itself.  They also reasonably could

have believed that the additional, temporary loss of the limited amount of recreation time and

property Acoolla had in segregation did not substantially burden his religious exercise above and

beyond the burdens already imposed by the provisions of DOP 864.[14]  § 2000cc-1.  The court

_____

[13]Acoolla submits a copy of a memorandum from Gene Johnson, dated May 19, 2000, and circulated to all VDOC wardens and superintendents, indicating that DOP 864 does not authorize more than three disciplinary charges for continued noncompliance with grooming standards. At that point, all but three of Acoolla's DOP 864-related disciplinary convictions were expunged. Even after Johnson's memorandum, however, officials allegedly continued to bring disciplinary charges against Acoolla when he continued to refuse to cut his hair.  Later, however, Johnson interpreted the policy to authorize additional disciplinary charges if the original charges had been expunged.

[14]Government action imposes a substantial burden on religious exercise if it "truly pressures the adherent to significantly modify his religious behavior."  Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004); Jenkins v. Angelone, 948 F. Supp. 543, 546 (E.D. Va. 1996) (finding that a substantial burden exists under RFRA "where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct

18

finds that defendants are entitled to summary judgment on the ground of qualified immunity as to all of Acoolla's claims for damages related to his noncompliance with the grooming policy. The court will, therefore, grant defendants' motion for summary judgment and deny plaintiff's motion as to such claims.

The court will deny both motions for summary judgment, however, as to Acoolla's RLUIPA claims for injunctive relief against Gene Johnson related to allegedly unauthorized disciplinary charges Acoolla has received under DOP 864.[15]  The court finds material facts in dispute as to whether prison officials have continued to charge Acoolla with multiple disciplinary infractions for noncompliance with DOP 864 after he had already received the three charges authorized under DOP 864, whether any of those charges remain on his record, whether he will receive any additional disciplinary charges for his ongoing noncompliance with the policy, and whether such additional charges further compelling state interests by the least restrictive means.

### C. Religious Beads

The court concludes that the defendants are also entitled to summary judgment as to their actions in August 2000 when Acoolla cut the religious beads out of his hair.  First, Acoolla can have no RLUIPA claim for damages regarding this incident because it occurred before the

_____

mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs") (quoting Thomas, 450 U.S. at 717).

[15]It is clear from the record that Johnson had, and as VDOC director still has, the ultimate authority to interpret the provisions of DOP 864 and to order injunctive relief regarding the policy and its enforcement if the court finds after a hearing that such relief is warranted.  Therefore, the court will grant summary judgment as to all other defendants named in Acoolla's claims concerning unauthorized disciplinary charges.

effective date of this statute in September 2000. Second, the officers' actions--enforcing the grooming policy and ordering Acoolla to comply with segregation property restrictions–were not unconstitutional. Acoolla was not in compliance with DOP 864, so officers assigned him to segregation, pursuant to the policy. Hair beads were not authorized property for segregation inmates, so they ordered him to remove the beads as contraband.[16] These actions are rationally related to, and promoted, legitimate security interests in segregating long-haired inmates from the general population and in uniform enforcement of segregation property restrictions. The court has already held that these aspects of DOP 864 are not an exaggerated response. Defendants' actions were also rationally related to furthering legitimate state interests in limiting the property segregation inmates have in their cells for security reasons. Officer Redman's alleged promise to place Acoolla in restraints if he did not remove the beads was, at most, an empty threat.[17] Instead, officers took Acoolla to the segregation unit with the beads still in his hair. Once he was in his cell, Acoolla himself chose to remove the beads to avoid any sanction for possessing contraband. After removing the beads, Acoolla was otherwise allowed to keep his hair and beard uncut, in keeping with his religious beliefs. He also retained the ability to

---

[16]Defendants' evidence indicates that hair beads are not included on the list of authorized property for segregation inmates. Acoolla produces property lists dated May 1999 that include a religious necklace and small religious items approved on a case-by-case basis. His evidence fails to prove, however, that his hair beads were approved for possession in segregation. He also fails to demonstrate that he had any right under VDOC policy to continue possessing an unapproved religious property item during the time it would take to seek its approval.

[17]Even assuming that the threat of four-point restraints in these circumstances violated prison policies, such state law violations do not state independent claims for relief under § 1983. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Moreover, because the court grants defendants' motion for summary judgment as to Acoolla's federal claim regarding his religious beads, the court declines to exercise supplemental jurisdiction over any state law claims arising from the same facts. See 28 U.S.C. § 1367(c).

worship and pray by himself in his cell and to possess a limited amount of religious literature or other items. The court finds no genuine issue of material fact in dispute under the Turner test, 482 U.S. at 89-91, and grants defendants' motion for summary judgment as to Acoolla's claims regarding the hair beads.[18] As defendants are entitled to judgment, the court will deny Acoolla's motion for summary judgment as to this claim.

## D. Prayer Oil

Defendants offer evidence that segregation inmates have used oils in the past to frustrate officers in their efforts to restore order and that the only way to control the risk of such abuse in the future is to forbid segregation inmates from possessing bottles of oil in their cells. Deferring appropriately to the expert opinions of experienced prison officials on this matter, the court concludes that the restriction against prayer oil in segregation furthers a compelling interest in maintaining security in that unit and does so by the least restrictive means. As stated, Acoolla retains the ability to practice his religious beliefs in other ways, such as by wearing his hair in long dreadlocks. Thus, the court finds no genuine issue of material fact in dispute under either the First Amendment or the RLUIPA standard. The court will grant defendants' motion for summary judgment as to Acoolla's prayer oil claims.

## E. Vegan Diet

Liberally construing Acoolla's complaint in July 2002, the court found that Acoolla had

---

[18]Acoolla does not expressly seek injunctive relief as to this claim. He asserts that being coerced into cutting his hair in August 2000 to remove the beads violated his religious beliefs; however, he does not ask that he be allowed to place beads in his hair now. In any event, he does not establish a religious need for the beads. He refers to the beads as "religious," but does not offer any evidence or explanation as to how they are necessary to practice of his beliefs. As he thus fails to establish a substantial burden on his religious practice, he fails to state any claim under the First Amendment or RLUIPA for injunctive relief related to the beads.

21

alleged facts stating a constitutional claim that officials had denied him a diet in keeping with his religious beliefs.[19] Specifically, the court finds that this claim has two facets: 1) rejection of Acoolla's requests for the Common Fare Diet; and 2) failure by the VDOC to provide a vegan diet option that would satisfy Acoolla's religious needs. Moreover, the court must address each of these claims under the First Amendment, RLUIPA, and state law.

Inmates have a constitutional right to receive a nutritious diet in keeping with their religious beliefs. Ross v. Blackledge, 477 F.2d 616, 618-19 (4th Cir. 1973). The right is not absolute, however. To survive a constitutional challenge, prison officials must prove that the decision not to provide the requested diet is rationally related to furthering a legitimate state interest. Turner, 482 U.S. at 89-91. Under RLUIPA, of course, officials face a higher burden of persuasion. They must prove that their decision not to accommodate the inmate's religious dietary needs furthers compelling state interests and that there are no less restrictive means to address those interests. § 2000cc-1(a)(1)-(2). Officials need not provide a special religious diet if the inmate can maintain an adequate diet by choosing items from the available menu. Abernathy v. Cunningham, 393 F.2d 775, 778 (4th Cir. 1968).

The court finds that defendants are entitled to summary judgment as to all of Acoolla's claims concerning denial of the Common Fare Diet. Common Fare includes meat dishes, while Acoolla's religious beliefs require a vegetarian, kosher diet with no animal by-products. Acoolla

---

[19]Although the complaint did not clearly define Acoolla's dietary claims, the court construed the claim as arising from his specific factual allegations and Claim 9 in the claims section of the pleading. See Pl. Compl., Dkt. #2, at para. 98-103, 112-13, 149, 153, 163-64, 167-68; p. 79, ¶9. During the course of the litigation, Acoolla has also made a specific request to the VDOC Faith Review Committee to receive a vegan diet for religious reasons, which was apparently denied for security reasons, but without any specific explanation. See Pl. Sum. Jdgmt. Resp., Dkt. #53, Exhibits at p. 19.

does not contradict defendants' evidence that eating only the nonmeat dishes of the Common Fare meals would leave Acoolla with nutritional deficiencies that could adversely affect his health. Prison officials have a constitutional duty to provide inmates with a nutritionally adequate diet, Jenkins, 948 F. Supp. at 547, and to provide them with necessary medical care for serious medical problems they might develop from nutritional deficiencies. Estelle v. Gamble, 429 U.S. 97 (1976). Therefore, the court finds that officials had compelling interests in ensuring that Acoolla did not receive a diet deficient in vital nutrients, and denying him the Common Fare Diet was the least restrictive way to alleviate that potential risk. Moreover, officials encouraged Acoolla to eat vegetarian selections from the regular food line, a diet that does provide sufficient nutrition. Admittedly, this vegetarian menu does not completely satisfy Acoolla's religious dietary needs because it is not kosher and includes dairy products and eggs. Nevertheless, given the choice between two available diets that did not meet his religious needs, officials reasonably denied Acoolla the diet that also clearly did not meet his nutritional needs. The court will grant defendants' motion for summary judgment as to Acoolla's First Amendment and RLUIPA claims that defendants violated his constitutional and/or statutory rights by denying him the Common Fare Diet.

A separate question remains: does Acoolla have a right under the First Amendment and/or RLUIPA obligating the VDOC to implement a vegan diet that would satisfy his religious beliefs? Defendants contend that they are entitled to qualified immunity against any claims for damages because they reasonably denied Acoolla a vegan diet after determining that his religious dietary needs could be met by the vegetarian diet already available to him. This defense fails. Defendants have not contested the sincerity or the religious nature of Acoolla's

23

asserted belief that he should observe kosher dietary laws and eat no animal by-products. Once

he has proven these elements of his claim, his personal religious exercise is entitled to First

Amendment and RLUIPA protections, even if most other Rastafarians believe a vegetarian diet

sufficiently satisfies their religious needs. See § 2000cc-5(7)(A) (defining religious exercise as

"any exercise of religion, whether or not compelled by, or central to, a system of religious

belief"); Thomas 450 U.S. at 715-16 (observing that "the guarantee of free exercise is not limited

to beliefs which are shared by all of the members of a religious sect"); LaFevers v. Saffle, 936

F.2d 1117 (10th Cir. 1991) (finding that "if inmate's religious views requiring a vegetarian diet

were sincerely held, he was entitled to vegetarian diet even if other members of his religious sect

did not adhere to a vegetarian diet").

On the other hand, in light of legal climate at the time of Acoolla's requests for a vegan

diet, defendants could reasonably have believed that denying prisoners a vegan diet furthered

compelling interests by the least restrictive means. RLUIPA did not exist at the time of his first

request. Neither the Supreme Court nor the Fourth Circuit have ruled that inmates have any

statutory or constitutional right to a vegan diet for religious reasons. Moreover, in 1996, the

United States District Court for the Eastern District of Virginia specifically held under RFRA

that the VDOC's decision not to implement a vegan diet was the least restrictive means to further

compelling interests in inmate health, security, and minimization of food costs and

administrative efforts. Jenkins, 948 F. Supp. at 547-48. Given this finding, the defendants could

reasonably have believed that denying Acoolla's request for a vegan diet was constitutional

under the less restrictive Turner test.

RLUIPA was in force at the time of Acoolla's second request for a kosher vegan diet.

24

Although the Supreme Court had held that RFRA's strict scrutiny standard for inmates' religious claims did not apply to state prisons, City of Boerne v. Flores, 521 U.S. 507 (1997), VDOC officials could reasonably have relied on the Eastern District court's reasoning in Jenkins that denial of a vegan diet met the all-but-identical compelling interest test in RLUIPA and so did not violate inmates' clearly established rights under that later statute. As such, the defendant officials in this case are entitled to summary judgment on the ground of qualified immunity as to any claims Acoolla may have for monetary damages related to denial of his vegan diet requests.

The court finds genuine issues of material fact in dispute, however, as to Acoolla's religious dietary claims for injunctive relief under the First Amendment and RLUIPA. First, the Jenkins decision, based on the VDOC food service of ten years ago at one prison, cannot be dispositive of Acoolla's claims for injunctive relief. Times have changed, laws have changed, and VDOC food service has changed. For example, the opinion in Jenkins indicates that at that time, only BKCC offered religious diets and increased need for fresh vegetables for a vegan diet would cause a need for additional storage space and food preparation there and create a risk that inmates would use the fresh produce to make alcoholic mash. 948 F.Supp. at 547-48. The record in this case indicates that the VDOC now provides the Common Fare diet, which includes prepackaged, kosher vegetables. This diet is available in many, if not all, of the VDOC facilities if the CCS approves an inmate's application. Accommodation of Acoolla's religious dietary needs today might be possible at very little additional cost by providing pre-packaged, vegan substitutes for the meat dishes in the Common Fare menu. Thus, the Jenkins holding does not decide the question of whether denial of a vegan diet to Acoolla under current conditions is constitutional or acceptable under RLUIPA.

25

Second, defendants' evidence is not specific enough to support a finding that failure to offer a kosher, vegan diet among the VDOC menu options is constitutional under Turner or defensible under RLUIPA. The record indicates that providing a nutritious, kosher vegan diet would necessitate unspecified increases in food costs and administrative efforts. While such increases may well qualify as compelling state interests, defendants' evidence does not establish that the costs or the administrative problems would be more than de minimis. Under Turner, if an accommodation could be provided at de minimus cost and effort, failure to provide that accommodation would be unconstitutional. 482 U.S. at 90-91. Likewise, RLUIPA expressly contemplates that a government may have to "incur expenses in its operations to avoid imposing a substantial burden on religious exercise." § 2000cc-3(c). Moreover, Acoolla submits evidence that the VDOC offered a nutritionally sufficient vegan diet for inmates from around 1982 until 1990. See also Nomad v. Baisden, Civil Action No. 84-0925-R (W.D. Va. 1986).[20] The evidence also indicates that Acoolla has no other way of obtaining a diet in keeping with his religious tenets, another facet of the Turner test. While defendants express a concern that many inmates will demand a vegan diet, thus further pushing up costs, they do not provide any specific reasons or evidence supporting this fear. The court finds it difficult to conceive that large numbers of inmates would jump on a bandwagon that excludes both meat and dairy products.

Based on the foregoing, the court concludes that Acoolla's claims for injunctive relief

─────────────────────

[20]An affidavit submitted in the Nomad case by Dorothy A. Cooke, then Director of Food Services for the VDOC, indicates that Cooke prepared a vegan menu in 1982 that was then made available to VDOC inmates who requested such a diet for religious or other reasons; she states that she took all actions related to the diet in fulfillment of her job responsibilities, one of which was "to plan and prepare nutritionally balanced cycle menus for . . . inmates who require special diets, such as those with certain religious affiliation."

26

regarding accommodation of his religious dietary needs survive summary judgment as to those

defendants with authority to provide the requested relief. The court will, therefore, deny the

defendants' motion for summary judgment as to Defendants Gene Johnson in his official

capacity as VDOC director and Lewis B. Cei in his official capacity as Special Programs

Manager for the VDOC and member of the CCS. Because the record indicates that decisions

about VDOC religious diets are centralized, however, it is clear that officers at individual prisons

have no authority to provide Acoolla the relief he seeks. As such, the court concludes that all

defendants except Johnson and Cei are entitled to summary judgment. See Smith v. Berry, 985

F.2d 180, 184 (4th Cir. 1993) (affirming directed verdict for prison guards not in position to "act

meaningfully" with regard to inmate's medical needs).

Acoolla has moved for summary judgment on the diet claim. He first argues that

defendants' motion is barred under the doctrine of res judicata and/or collateral estoppel based

on the Nomad case. Because issues of fact and law in this case differ greatly from those litigated

in Nomad, and because none of the parties are the same, neither res judicata nor collateral

estoppel are applicable here. See, e.g., In re Microsoft Corp. Antitrust Litig., 355 F.3d 322, 326

(4th Cir. 2004). Second, Acoolla argues that defendants have not met their burden of proof under

RLUIPA. The court cannot find that plaintiff is entitled to summary judgment as a matter of law

on this issue, however. His complaint did not offer a clear statement of this claim, making it

difficult for defendants to address all aspects of the claim in their motion for summary judgment.

Also, the record is simply insufficient at this time to support a finding as a matter of law that

defendants could not prove that refusing to implement a vegan diet for inmates furthers

compelling interests by the least restrictive means. Therefore, the court must deny plaintiff's

Case 7:01-cv-01008-JCT   Document 130   Filed 04/10/06   Page 27 of 29   Pageid#: 482

motion for summary judgment.

To develop the facts relevant to the diet claim and the remaining claim concerning disciplinary charges under DOP 864, the court will schedule an evidentiary hearing. Plaintiff has invoked his right to a jury trial. Herein, however, the court grants defendants' motion for summary judgment as to all plaintiff's claims for monetary relief. The only remaining claims seek injunctive relief. As plaintiff is not entitled to a jury trial as to claims for such equitable relief, the court may properly resolve the matter without impaneling a jury. See Skippy, Inc. v. CPC Intern, Inc., 674 F.2d 209, 215 (4th Cir. 1982) (finding that where court had properly dismissed claims for damages, remaining claims for injunctive relief could be determined without jury).

### III. State Law Claims

Finally, the court finds no justification for continuing to exercise supplemental jurisdiction over any of Acoolla's state law claims. He fails to demonstrate that state statutes or regulations provide him with protections exceeding the guarantees of the First Amendment or RLUIPA. Moreover, separate resolution of these claims would require extensive investigation and interpretation of state regulations and precedent that would likely predominate over the federal issues remaining before the court. Therefore, the court will dismiss all state law claims without prejudice, pursuant to 28 U.S.C. § 1367(c).

### IV. Conclusion

As to the majority of plaintiff's federal claims, the court concludes that defendants are entitled to summary judgment. Furthermore, the court declines to continue supplemental jurisdiction over any state law claims and will dismiss them without prejudice. The court will,

28

however, deny summary judgment on two matters and set them for an evidentiary hearing: the RLUIPA claim for injunctive relief against Gene Johnson regarding unauthorized disciplinary charges for noncompliance with the grooming policy, DOP 864; and the RLUIPA and First Amendment claims for injunctive relief against Gene Johnson and Lewis Cei regarding accommodation of Acoolla's ongoing request for a vegan diet in keeping with his religious tenets. An appropriate order shall be issued this day.

The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER: This _10th_ day of April, 2006.

_James C. Turk_

Senior United States District Judge