# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 0 1 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

|  |  |  |
|---|---|---|
| SHAKA ZULU ACOOLLA, | ) | |
| a.k.a. THOMAS JACKSON, | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:01-cv-01008** |
|  | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
|  | ) | **CONCLUSIONS OF LAW** |
|  | ) | |
| RON ANGELONE (dismissed), | ) | |
| GENE JOHNSON, LEWIS CEI, | ) | **By: Hon. James C. Turk** |
| **Defendants.** | ) | **Senior United States District Judge** |

Plaintiff Shaka Zulu Acoolla, a Virginia inmate proceeding pro se, brought this action under the Civil Rights Act, 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, with jurisdiction vested under 28 U.S.C. § 1343 and § 1331, respectively. On July 28, 2006, the court conducted a bench trial on the two issues remaining before the court:

> a.  plaintiff's claim for injunctive relief under RLUIPA against Defendant Gene Johnson in his official capacity, alleging that officials have brought and may continue to bring disciplinary charges against plaintiff for noncompliance with the Virginia Department of Corrections (VDOC) grooming policy, Division Operating Procedure (DOP) 864, although he has already received the three disciplinary charges authorized under the policy for noncompliance; and

> b.  plaintiff's claims for injunctive relief under the First Amendment and RLUIPA against Defendants Gene Johnson and Lewis Cei in their official capacities regarding accommodation of plaintiff's religious need to practice a strict vegetarian or vegan diet.

For the reasons stated, the court now enters judgment for the defendants. Pursuant to Fed. R. Civ. P. 52(a), the following opinion sets forth the court's findings of fact and conclusions of law.

1

## PROCEDURAL BACKGROUND

Acoolla filed this case in December 2001, raising many claims. After the court summarily dismissed some claims, pursuant to 28 U.S.C. § 1915A, in December 2002, defendants filed a motion for summary judgment, and Acoolla responded. Because defendants challenged the constitutionality of RLUIPA as applied to state prisons, the United States intervened to defend the statute. On June 4, 2003, the court stayed the action, pending resolution of an appeal on similar issues that was then pending. See Madison v. Riter, 240 F. Supp. 2d 566 (W.D. Va. Jan. 23, 2003), rev'd 355 F.3d 310 (4th Cir. Dec. 8, 2003), cert. denied, 125 S. Ct. 2536 (March 30, 2005). The court maintained the stay during a subsequent petition for a writ of certiorari in the Madison case and dismissed the pending motion for summary judgment without prejudice. After the Supreme Court decided Cutter v. Wilkinson, 544 U.S. 709 (2005), holding that RLUIPA does not violate the Establishment Clause, the high court also denied certiorari in Madison. This court then reinstated Acoolla's case to the active docket and granted defendants an opportunity to file dispositive motions on the merits of his religious rights claims. Defendants filed such a motion and also incorporated by reference all the arguments and exhibits from their previously filed motion for summary judgment. By opinion and order entered April 10, 2006, the court granted defendants' motions for summary judgment as to all but Acoolla's claims for injunctive relief regarding multiple charges for violating DOP 864 and regarding his desire for a vegan diet in keeping with his religious beliefs.

The court then conducted a bench trial on July 28, 2006. Acoolla was present and presented his case, including his own testimony, numerous documentary exhibits, and testimony from three witnesses: inmate Albert Chavies; inmate Ivan Sparks; and Janet B. Taylor of the

2

Universal Negro Improvement League in Richmond, Virginia. Mr. Sparks and Ms. Taylor testified by telephone. Acoolla also incorporated by reference all exhibits he had submitted to the court during the course of this litigation. Defendants presented testimony from five VDOC administrators: Duncan Mills, Classification/Security Manager; Dr. Lewis Cei, Special Programs Manager; Linda Shear, Chief Dietician; Sam Wood, Food Service Director; and Gary Bass, Chief of Operations. The parties made brief closing arguments, and the court took the matter under advisement. Pursuant to Fed. R. Civ. P. 52(a), the following sets forth the court's Findings of Fact[1] and Conclusions of Law.

## FINDINGS OF FACT

### A. Acoolla's Religious Beliefs and Practices

Acoolla is a 47-year-old African-American with long dread locks. He has been confined in the VDOC prison system since 1996 on his most recent criminal sentences and has an estimated release date in March 2009. At the time of trial, Acoolla was assigned to Sussex II State Prison, but during the ten years of confinement since 1996, he has been transferred nine times.

Acoolla professes to be a Rastafarian of the Nyahibinghi order, the most ancient order among numerous sects of Rastafarian believers. These sects share some of the same religious

_____

[1]Acoolla is proceeding in forma pauperis in this civil case, and no party has requested transcription of the trial. The court reviewed the court reporter's backup audio tapes and its own notes in making these Findings of Fact. Herein, the court references specific exhibits or the testimony of a specific witness ("T. of _____"), rather than transcript pages. Findings regarding Acoolla's beliefs and practices are based on his testimony and documentation he presented to the court at trial or during the litigation.

3

tenets, but each sect has also developed other, unique beliefs. (T. of Taylor) Individual beliefs within the Nyahibinghi order also vary. (Id.) Like many Rastafarians, Acoolla's personal religious beliefs require that he keep his hair and beard uncut. Rastas also eat only foods that are "Ital" (a word analogous to "kosher," meaning natural, pure and clean).

Acoolla believes that Ital requires him to consume a strict vegetarian diet (also known as a "vegan" diet). [2] In support of this belief, he submitted "The Rastafarian UniverSoul [sic] Order ReBirth 2000," a nine-page description of general Rastafarian beliefs and practices. (Dkt. No. 11, unnumbered exhibit) One-half page of this document describes an Ital diet as embracing fruits and vegetables, but forbidding consumption of meat, fish, eggs or poultry, because eating such "dead flesh" items desecrates one's body by making the stomach a "cemetery." Rastafarians belief that Jah (god) commanded humans to eat vegetables and fruit as their meat and that the human body is a reflection of the divine to be treated with respect. The UniverSoul document also lists Old Testament verses like Psalms 104:14, "He causeth the grass to grow for the cattle, and herb for the service of man that he may bring forth food out of the earth." Acoolla interprets this verse and similar Biblical passages to mean that he should eat only those foods that can be grown from the ground, such as raw fruits and vegetables, whole grains and nuts. As animals are not grown from the ground, he should not eat any meat or other animal by-products, including eggs, milk, and cheese. For the same reason, he eschews sugar or salt and all foods processed using any animal by-products, such as white flour bread (he believes that white flour is

---

[2]Janet B. Taylor testified that she is a Rastafarian of the Nyahibinghi order, the same order as Acoolla professes; yet, Ms. Taylor's personal beliefs allow her to eat a diet that includes fish.

4

bleached using a pork by-product).[3] He also believes personally that his foods should not be prepared or served on dishes that have been in contact with animal by-products, even if the dishes have been sanitized between uses. Acoolla believes that the vegan diet is not only consistent with his personal interpretation of the Bible and Rastafarian principles, but also that it is a healthy diet.

Acoolla has been a practicing Rastafarian for twenty years or more. He served a previous term of imprisonment in the VDOC, starting in the mid-1980s. At that time, Nottoway Correctional Correctional ("Nottoway") provided a so-called Rastafarian (vegan) diet for inmates professing that religion. Inmate Sparks was an elder of the Rastafarian community in the Virginia Penitentiary in Richmond in 1984 when this Rastafarian diet was implemented after a court action. (T. of Sparks) Inmate Chavies worked as a cook at the Virginia Penitentiary during the same time period and was assigned to prepare a Rastafarian diet for approved inmates. (T. of Chavies) This special diet included no meat and served a choice of either raw or cooked vegetables. (Id.) Chavies later transferred to Nottoway, where he also worked as a cook, preparing the Rastafarian diet. (Id.) He met Acoolla there in 1988 as one of the inmates

_____

[3]At trial, Acoolla submitted a photocopied portion of an article from the Georgetown Law Journal about Rastafarianism that defines Ital as excluding not only meats and eggs, but also dairy products, white flour breads, alcohol, sweets, and salt. (P. Ex. 5 at 1608)

5

approved for the Rastafarian diet.[4] (Id.) In 1990 or 1991, what had been the Rastafarian diet became a vegetarian diet instead of a vegan diet. (T. of Sparks)

## B. Common Fare Diet

Defendants' witnesses were not aware that the VDOC had ever approved a Rastafarian or vegan diet to be served to inmates. (T. of Cei, Wood) Special religious diets have been provided at Buckingham Correctional Center ("Buckingham") for Jewish, Nation of Islam, and Muslim inmates, and individual institutions may have offered a Rastafarian diet at one time. (Id.) These special diets, however, are being phased out. (Id.) As an alternative to offering numerous diets, each specific to only one religious faith, the VDOC developed the Common Fare Diet that is designed to meet the religious dietary needs of many faiths. (T. of Cei) This diet includes meat, but does not include any pork products and meets kosher standards. (Id.) The fruits and vegetables prepared for Common Fare inmates come from the same stock that the VDOC food service department purchases for the regular inmate menus. (T. of Wood)

---

[4]This court's records in Nomad v. Braisden, Civil Action No. 84-0925( R), to which Acoolla referred during the litigation of this case, indicate that some VDOC facilities, including Bland Correctional Center, also offered a vegan diet in the mid-1980s. In an affidavit dated September 27, 1984, Dorothy Cooke, Chief Dietician for the VDOC, stated that in November 1983, she had prepared a seven-day menu cycle for inmates, including Rastafarians, who sought to follow a strict vegetarian diet. This diet omitted all meat and diary products and provided raw or freshly cooked vegetables and fresh fruits. Id., Defts.' M. Summ. J. Ex. II.

6

Because the Common Fare Diet is much more expensive than the normal prison fare,[5] inmates must make application at the institution to receive it. (T. of Cei) An institutional committee first reviews such applications, conducts a hearing with the inmate, gathers facts about the inmate's religious practices, his behavior, his attendance of religious services, and other factors, and approves or denies the application. (Id.) This decision is then reviewed by a Common Fare Diet committee of three individuals in Richmond. (Id.) Dr. Cei chaired this committee for several years and continues to be a member. (Id.) An inmate's application will be approved only if the committee is satisfied that he is a sincere believer of a religious faith requiring a kosher diet. (Id.) Dr. Cei only knows of four religions that require the Common Fare Diet elements: Judaism, Nation of Islam, Muslim, and House of Yahwah. (Id.)

## C. DOP 864 and Acoolla's Religious Diet

When Acoolla reentered the VDOC system in 1996, no vegan diet was available. He ate from the regular serving line the food items that met his vegan dietary requirements and supplemented this diet with items he purchased from the commissary: soup (minus the salt packets), peanut butter, oatmeal, and crackers made with vegetable oil. In this way, as long as he was housed in the general population, he was able to follow his religious diet and obtain adequate nutrition.

_____

[5]Sam Wood testified at trial that to feed an inmate the regular VDOC diet or the alternative entree diet, the food service department budgets $2.00 per day, including purchase of supplies, preparation, and serving. By comparison, to feed an inmate the Common Fare Diet, the department budgets between $5.00 and $6.00. The meat entrees for the Common Fare menu, prepackaged and purchased from a kosher vendor are a fixed cost, but certain other items purchased especially for the Common Fare diet, such as sardines, vary in cost.

7

In December 1999, however, the VDOC implemented DOP 864, requiring all inmates to shave their beards and wear their hair no longer than one inch. Pursuant to DOP 864, those inmates who remain in noncompliance with these grooming standards are assigned to administrative segregation and as a result, lose a number of privileges. One segregation restriction limits greatly the type of items an inmate may purchase in the commissary.

As stated, pursuant to his religious beliefs, Acoolla does not cut his hair or his beard.[6] When an officer ordered him to comply with DOP 864 on December 16, 1999, Acoolla refused. Within weeks, he was reassigned to administrative segregation and could no longer purchase food from the commissary to supplement the items he could eat from the regular prison menu. This problem persists to this day, as he has continued to be noncompliant with DOP 864.

The VDOC does not currently offer a vegan diet, excluding all meat and dairy products. (T. of Shear) In her affidavit in support of the motion for summary judgment, Ms. Shear stated that such a diet would be nutritionally inadequate in vital nutrients, including protein, calcium, vitamin B12, vitamin D, riboflavin, and zinc. (Defts.' M. Summ. J, Shear Affid. ¶ 4)

While in segregation, Acoolla has attempted to meet his religious dietary needs by ordering the alternative entree menu ("AEM"). This diet is vegetarian (no meat), but is neither vegan nor kosher and includes eggs and dairy products. (T. of Shear) An inmate requesting the AEM receives all food items that an inmate on the regular VDOC food line would receive except the meat dishes. (Id.) In place of the meat, an AEM inmate receives a meat substitute: at breakfast, cheese or peanut butter (at the discretion of the prison where he is housed), and at

_____

[6]He informed the court during a pretrial telephone conference that his hair is now four to five feet long. At the hearing, he wore his hair wound around the top of his head.

8

lunch and dinner, a serving of beans. (Id.) The regular food line and the AEM both include cooked and raw vegetables and fruit. (Id.)

When he gets his AEM meals, Acoolla eats the fruits and vegetables, rice, potatoes, and bread. He does not eat (or drink) the milk, eggs, cheese, and sweet desserts included in the AEM several times per week, as these items that do not fit his dietary requirements. He does now eat the white flour bread served with AEM meals, despite his undocumented belief that it is processed using a pork product. Acoolla is sometimes able to trade dessert or dairy items from his tray to other inmates in exchange for additional vegetable or bread items. At the time of the hearing, Acoolla reported that his weight was between 235 and 240 pounds and characterized this amount as low for him, as he is over six feet tall.[7] He also characterized himself as healthy and appeared so.

**D. Acoolla and the Common Fare Diet**

In July 2000 and again in mid-2001, Acoolla applied to receive the Common Fare Diet. He believed then, and argues now, that compared to other VDOC menu options, the Common Fare Diet provides more food items that fit into a vegan regime, such as whole wheat bread, rye bread, more fruits and vegetables. He also likes the fact that all the food items on the Common Fare Diet are prepared and served on dishes that have never been used to prepare pork. If granted the Common Fare Diet, Acoolla would simply omit the meat and the dairy items. He admits that the breads offered with the Common Fare Diet likely contain dairy products, but he feels that

_____

[7]Acoolla testified, and presented grievances complaining, that he lost seventy pounds in 2004 during a period when he was not eating white bread, so now he eats the bread.

9

because they contain whole grains, they are more in keeping with his religious beliefs than the white bread offered with the AEM meals.

The Common Fare Diet committee in Richmond refused Acoolla's requests, however, stating that his professed religion did not require the Diet and that the AEM met his dietary needs. Dr. Cei based this response on his personal research of the Rastafarian faith and discussions with Rastafarian leaders in Washington, D.C. (T. of Cei) From this research, Cei determined that Rastafarians eat a vegetarian diet and that the AEM meets this need for VDOC inmates of the Rastafarian faith. (Id.)

The Common Fare Diet does not provide meat substitutes. Linda Shear testified that if an inmate ate only the non-meat, non-dairy items from the Common Fare menu, he would not obtain sufficient nutrition. (T. of Shear) Such a practice would leave the inmate short of protein, calcium, Vitamin B-12, and zinc, at a minimum. (Id.) Acoolla testified that vegan meat substitutes, readily available from commercial vendors, and leafy green vegetables or other natural foods could provide him with protein and nutrients.

## E. DOP 864 Disciplinary Charges

When an inmate first refuses a direct order to cut his hair or beard in compliance with DOP 864, he is charged with a disciplinary code violation and is placed on pre-hearing detention. If convicted of the charge, he will serve a five-day isolation sentence. If he is convicted of two more such violations, he will serve two more isolation sentences of ten days and fifteen days, respectively, and then be referred to the Institutional Classification Authority ("ICA") for assignment to segregation, possible reclassification to a higher security level, and a possible reduction in the rate at which he can earn good time or earned sentence credit. The

10

inmate will remain assigned to segregation until he fully complies with the grooming standards. Department policy is that an inmate cannot be convicted more than three times of a disciplinary offense for failing to comply with the DOP 864 grooming standards. (T. of Bass)

Because Acoolla refused to comply with these grooming standards, he received three disciplinary charges–on December 16 and 30, 1999, and January 7, 2000. (for records on Acoolla's disciplinary charges, see P. Ex. 6; Dkt. No. 11, unnumbered exhibits) He served thirty days in isolation for these convictions. The parties agreed at trial that pursuant to DOP 864 itself, Acoolla should not have received any further disciplinary charges for noncompliance with grooming standards. On March 30, 2000, however, he was again charged for disobeying a direct order to comply with DOP 864. He was found guilty and served fifteen days in isolation. On April 25, 2000, he received a fifth charge for noncompliance with the DOP; again, he was convicted and served fifteen days in isolation. VDOC Director Gene Johnson issued a memo to all VDOC wardens on May 19, 2000, reminding them that inmates should not be convicted more than three times under DOP 864. Later that year, the VDOC expunged several convictions from Acoolla's central file in Richmond. Nevertheless, Acoolla was charged again and again for being noncompliant with grooming standards; he provided some documentation for such charges received on August 1 and 10, October 9, 12 and 26, and November 28, 2000; January 5, 2001; January 29, February 6, 11, 13, 23, and March 3 and 8, 2004. Acoolla testified that he had been charged more than 19 times with noncompliance with the DOP 864 grooming standards and that he had served over 100 days in isolation on these convictions. Even if a disciplinary conviction is later overturned on appeal or expunged, by that time, the inmate has already served the isolation penalty. (T. of Bass)

11

Mr. Bass, VDOC Chief of Operations, agreed that officials had erroneously charged Acoolla with at least four more violations of DOP 864 than authorized by the policy itself. (Id.) He verified that Acoolla's central VDOC file now shows only three charges for noncompliance with the grooming standards and that all other charges have been expunged from all records related to computation of Acoolla's term of confinement.[8] (Id.) Bass also stated that in the weeks after the hearing in this case, he would be reminding VDOC wardens, disciplinary hearings officers, and other administrators throughout the prison system that no inmate should receive more than the three authorized charges for noncompliance with DOP 864 grooming standards.

## CONCLUSIONS OF LAW

### I. Religious Diet Claims

#### A. First Amendment Standard

To state a cause of action under §1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). Inmates clearly retain protections under the First Amendment, including the right to free exercise of religious beliefs. Cruz v. Beto, 405 U.S. 319, 322 (1977).

---

[8]Acoolla complained that in March 2000, his estimated release date (with good conduct time) was October 2005, but within a few months after he received the first three to five disciplinary convictions for violation of DOP 864 in 1999 and 2000, the estimated release date moved to May 2009. Bass explained at trial that this change in estimated release date was likely caused by Acoolla's inability to earn as much good conduct time as he had been able to earn before the implementation of DOP 864 in December 1999, because of the limited rehabilitation and education programs and work opportunities available to segregation inmates.

12

A sincere, but personal religious belief warrants this constitutional protection, regardless of whether the belief is mandated by a particular, established religion or held by a majority of the believers within a religion. Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 716 (1981) (finding that federal courts are not to sit as arbiters of religious orthodoxy). Inmates have a constitutional right to receive a nutritious diet in keeping with their sincere religious beliefs. Ross v. Blackledge, 477 F.2d 616, 618-19 (4th Cir. 1973). An inmate must first demonstrate, however, that the requested diet is based in his sincere, religious belief and that the diet choices already available to him substantially burden his religious practice. See Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-51 (1988) ("[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, [do not] require government to bring forward a compelling justification for its otherwise lawful actions"). Officials need not provide a special religious diet if the inmate can maintain an adequate diet by choosing items from the available menu that do not offend his sincere beliefs. Abernathy v. Cunningham, 393 F.2d 775, 778 (4th Cir. 1968).

In deference to the expertise of prison administrators in managing the difficult challenges of incarceration, even a prison policy that substantially burdens an inmate's ability to practice his religious beliefs withstands a First Amendment challenge so long as it is rationally related to a legitimate governmental interest. Turner v. Safley, 482 U.S. 78, 89-81 (1987); O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). Turner requires the court to consider four factors: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether there are alternative means of exercising the asserted

13

constitutional right that remain open to inmates; © whether the extent to which accommodation

of the asserted right will have an impact on prison staff, on inmates' liberty and on the allocation

of limited prison resources; and (d) whether the regulation represents an "exaggerated response"

to prison concerns. Id. at 89-91.

## B. Religious Land Use and Institutionalized Persons Act

RLUIPA prohibits governments from taking actions that impose a "substantial burden on

the religious exercise of a person residing in or confined to an institution," unless the government

demonstrates that imposition of that burden furthers "a compelling governmental interest" by

"the least restrictive means."[9] § 2000cc-1(a)(1)-(2).  The statute defines religious exercise as "any

exercise of religion, whether or not compelled by, or central to, a system of religious belief."  §

2000cc-5(7)(A).  Plaintiff bears the burden of proving that the challenged prison practice or lack

of religious accommodation places a substantial burden on his exercise of sincere religious

beliefs.  § 2000cc-2(b).  Only after plaintiff carries this burden must the government prove that

the imposition of the burden (or refusal to accommodate plaintiff's belief) furthers a compelling

interest by the least restrictive means.  Id.

RLUIPA does not define "substantial burden."  Neither the Fourth Circuit nor the United

States Supreme Court has defined the term as used in RLUIPA.  Moreover, in the First

Amendment context, the Supreme Court has articulated the substantial burden test differently

_____

[9]Defendants do not contend that RLUIPA is inapplicable to state prisons or to Acoolla's
remaining claims.  They do, however, reserve the right to challenge the constitutionality of RLUIPA
as applied to state prisons.

14

over the years,[10] and the circuit courts to define the term as it is used in RLUIPA have reached no

consensus. See Adkins v. Kaspar, 393 F.3d 559, 568 (5th Cir. 2004) (citing other cases), cert.

denied, 125 S. Ct. 2549 (2005). Adkins focused on lawmakers' intention that "substantial

burden" in RLUIPA should be interpreted under Supreme Court precedent. Adkins, 393 F.3d at

569 (citing 146 Cong. Rec. S7776 (July 27, 2000). Applying this principle in light of the

statutory language itself and the other circuit courts' opinions, the Fifth Circuit held that in the

context of RLUIPA,

> a government action or regulation creates a "substantial burden" on a religious
> exercise if it truly pressures the adherent to significantly modify his religious
> behavior and significantly violates his religious beliefs. And, in line with the . . .
> teachings of the Supreme Court, the effect of a government action or regulation is
> significant when it either (1) influences the adherent to act in a way that violates
> his religious beliefs, or (2) forces the adherent to choose between, on the one
> hand, enjoying some generally available, non-trivial benefit, and, on the other
> hand, following his religious beliefs.

Id. at 570 (footnotes omitted). While plaintiff need not prove that the religious practice at issue

is central to his religious beliefs, he must prove "the honesty and accuracy of his contention that

[it] is important to the free exercise of his religion." Id. See also Cutter, 544 U.S. at 725 n. 13

("[P]rison officials may appropriately question whether a prisoner's religiosity, asserted as the

---

[10]See, e.g., Lyng, 485 U.S. at 450-51 (no substantial burden unless regulation has "tendency
to coerce individuals into acting contrary to their religious beliefs"); Hobbie v. Unemployment
Appeals Comm'n of Fla., 480 U.S. 136, 141 (1987) (substantial burden where government put
"substantial pressure on an adherent to modify his behavior and to violate his beliefs"); Bowen v.
Roy, 476 U.S. 693, 707-08 (1986) (no substantial burden where government action only interfered
with, but did not coerce, individual's religious beliefs); Thomas, 450 U.S. at 717-18 (substantial
burden where government put "substantial pressure on an adherent to modify his behavior and to
violate his beliefs"); Sherbert v. Verner, 374 U.S. 398, 404 (1963) (substantial burden when
individual must "choose between following the precepts of her religion and forfeiting benefits, on
the one hand, and abandoning one of the precepts of her religion . . . on the other").

basis for a requested accommodation, is authentic."). This court adopts the definition of "substantial burden" as set forth in <u>Adkins</u>.

## C. Acoolla's Sincere Religious Beliefs

The court finds by a preponderance of the evidence that Acoolla sincerely seeks to follow the beliefs of Rastafarianism. In reaching this finding, the court relies on his testimony as well as the evidence that he applied and approved for the Rastafarian diet during his previous incarceration in the VDOC in the late 1980s and that he has continued to keep his hair and beard uncut in keeping with his Rasta beliefs, despite the DOP 864 penalties for noncompliance with the grooming standards.

Moreover, Acoolla offered documentation and the testimony of Ms. Taylor to support his assertion that his vegan dietary preference is based on a religious principle: keeping the body pure and healthy as an image of the divine. When he is not incarcerated, Acoolla strives to comply with such a diet, despite dietary differences with his Christian wife and children. Since his incarceration, he has tried to avoid eating meat, dairy products, sugar and salt. Thus, the court finds that Acoolla has a sincere, religious belief that he should maintain a vegan diet, avoiding all animal by-products, sugar and salt.

Acoolla also desires a vegan diet for health reasons, however. He testified and offered evidence that a vegan diet without salt and sugar is a healthy life style. He and his witnesses said they did not get sick from eating a vegan diet when they were able to obtain it, and Acoolla testified that he is in good health now, eating a substantially vegan diet. Of course, a personal preference for a vegan diet based on health reasons is not entitled to First Amendment or RLUIPA protections.

16

**D. No Substantial Burden**

The court cannot find that the state's failure to provide Acoolla with a special vegan diet is substantially burdening his religious exercise. First, the vegetarian diet (the so-called "Alternative Entree Menu" (AEM)) currently provided to Acoolla contains no meat products. The record contains no evidence that the vegetables or bread served on this diet are prepared with meat or meat by-products. The fact that the AEM includes eggs, milk and sweets on occasion does not mean that the VDOC is forcing Acoolla to eat these items in violation of his religious beliefs.[11] He admits that he simply discards such dishes or trades them to other inmates for food that fits his religious dietary profile. He may also be able to request peanut butter with his breakfast meal instead of eggs or milk. Thus, the court finds that Acoolla is substantially able to comply with his stated religious diet by selecting appropriate items from the AEM menu currently available to him.

Acoolla complains that the AEM includes foods (such as bread) that may be prepared with dairy products and salt and that the AEM meals are served on plastic trays also used to serve meat products to other inmates on the main prison menu. Acoolla offered no evidence, however, explaining why these minor dietary shortcomings are important to his religiosity itself. He has not documented any specific, religious basis for these aspects of his dietary preferences in the first place.[12] More importantly, Ms. Taylor testified that being Rastafarian is about praising

---

[11] See Frazier v. Ferguson, No. 04-5140, slip op., 2006 WL 2052421, at *4 (W.D. Ark. 2006) (finding no substantial burden under RLUIPA where Seventh-day Adventist inmate received vegetarian diet and had to discard some items that did not comport with his religious preference for vegan diet).

[12] See Smith v. Beauclair, No. CV-03-222-C-EJL, slip op., 2006 WL 2348973, at *9 ( D. Idaho 2006) (finding no RLUIPA violation where inmate had not demonstrated specific religious

17

"Jah." Acoolla has not proven that occasionally eating bread or other items made with a trace of dairy products or salt or using sanitized trays that may once have held a hamburger harms his ability to praise or worship Jah or otherwise to express his adherence to his religious beliefs.[13] Thus, he has not proven the importance of these requested accommodations to his religious exercise.

Acoolla would like to have more natural grains included in the diet, such as whole wheat bread or rye bread. He fails to demonstrate, however, how the omission of these preferred breads harms him or his religious exercise in any specific way.[14]

Finally, and most importantly, the record, including Acoolla's own testimony, reflects that Acoolla is healthy and is maintaining a healthy weight while eating the AEM diet minus the eggs and dairy products. Acoolla presented no medical evidence at trial that his health or well being is suffering under his current diet. Thus, the court cannot find that his current diet is nutritionally inadequate to maintain his health.

In conclusion, the court finds no evidence that the diet currently available to Acoolla pressures him into modifying any important aspect of his religious exercise in any significant way. Therefore, he has not demonstrated any substantial burden on his religious exercise resulting from the VDOC's failure to provide him with a special, vegan diet. Adkins, 393 F.3d at

---

basis for the requested dietary accommodations).

[13]The record is devoid of evidence that the VDOC's process of sanitizing food trays fails to remove all significant traces of food.

[14]See Kretchmar v. Beard, No. 05-6108, slip op., 2006 WL 20386887, at * 5 (E.D. Pa. 2006) (finding no RLUIPA or First Amendment violation where inmate received nutritionally adequate kosher diet, although it was repetitious and cold).

18

570. As Acoolla has not met his burden of proof as to the "substantial burden" element of his religious claims under RLUIPA and the First Amendment, the court need not reach the question of whether the VDOC's failure to provide Acoolla with a special vegan diet furthers a compelling interest by the least restrictive means under RLUIPA or meets the rational basis standard under the First Amendment.[15] § 2000cc-2(b); Lyng, 485 U.S. at 450-51. The court will grant judgment for the defendants as to Acoolla's religious diet claims.


## II. Unauthorized Disciplinary Charges

### A. Injunctive Relief Standard

This court's ability to issue injunctions against state officials is limited by the principles of federalism to cases in which the plaintiff demonstrates a real and immediate threat of injury. Los Angeles v. Lyons, 461 U.S. 95, 102-06 (1983). The plaintiff must show that he "is immediately in danger of sustaining some direct injury" that is both "real and immediate," not "conjectural" or "hypothetical." Id. at 102. Evidence of past injuries alone, even repeated ones, is probative evidence of injury, but does not prove an immediate and direct threat of future injury

---

[15]In any event, the court is satisfied that defendants' failure to provide a vegan diet for Acoolla does not violate the First Amendment, even if Acoolla could show a substantial burden on his religious exercise. Defendants have a legitimate interest in limiting the number of diet choices provided to inmates, as each separate menu requires additional expenses for planning, purchasing, storing, preparing, and serving. Simply offering a vegan substitute for the kosher meat entrees on the Common Fare Diet, as Acoolla suggested, would not satisfy strict vegan dietary rules, because the Common Fare includes dairy products and eggs. Also, the Common Fare Diet is more than three times as expensive as the regular inmate menu. Offering one vegetarian menu furthers defendants' interests in limiting costs by limiting menu options and by not encouraging other inmates to request accommodation of additional, special diets under the auspices of religious practice. Acoolla has other means of practicing his religious beliefs, such as wearing his hair uncut and, most importantly, consuming a diet that substantially comports with his beliefs. Thus, Acoolla's First Amendment claim also fails under the factors of Turner. 482 U.S. at 89-81.

sufficient to warrant injunctive relief, particularly when the injuries were caused by actions in contravention of a government organization's policies. Id. at 103-04. In a prisoner civil rights action, the court's power to issue injunctive relief is further limited by statute. Under 18 U.S.C. §3626(a)(1)(A), in a civil case concerning prison conditions, a federal court may issue prospective relief only to the extent necessary to correct the violation of the federal right of a particular plaintiff or group of plaintiffs.

## B. Acoolla's Disciplinary Charges

Defendants conceded at trial that Acoolla was wrongfully charged with many more infractions of DOP 864 than the three charges authorized by the regulation.[16] They did not argue under RLUIPA, therefore, that the additional charges furthered any compelling security interest. Although Acoolla's rights were violated, however, the court concludes that no injunctive relief is warranted. The court finds that defendants have taken appropriate action to correct any ill effects the extra charges in the past may have had on Acoolla's release date or other issues related to his term of confinement. Acoolla did not prove that his estimated release date or housing assignment are any different now than they would have been if he had not received any unauthorized disciplinary charges for violating DOP 864. Thus, any violation of Acoolla's rights related to the disciplinary convictions has been corrected to the extent possible.[17]

---

[16]The specific number of unauthorized charges is not necessary to the court's ruling today on the only remaining claim for injunctive relief.

[17]The many days of isolation confinement that Acoolla served as a result of the wrongful disciplinary convictions cannot be corrected, of course, and the court has already ruled that defendants have qualified immunity against any claim for monetary damages related to those convictions.

20

Moreover, the court concludes that Acoolla failed to prove that he is in immediate or direct danger of receiving unauthorized charges in the future for his noncompliance with the DOP 864 grooming standards. The last such charge occurred in March 2004. Official VDOC policy has been, and continues to be, that inmates may only receive three disciplinary convictions for violating DOP 864. Johnson and Cei, and the other VDOC administrators who testified at trial, have promised to take appropriate action to ensure that in the future, wardens and hearing officers at the individual VDOC institutions are fully aware of, and will comply with, this policy. Thus, the court finds no immediate danger that Acoolla or other noncompliant inmates will be charged more than three times for violating DOP 864 standards. The court will deny Acoolla's request for injunctive relief accordingly and enter judgment for the defendants.

Nevertheless, the court is disturbed by the potential for abuse of the DOP 864 penalty or at the very least, for its repeated, negligent misuse, even in clear violation of VDOC policy. Under the current system, a careless or vindictive officer could charge Acoolla with noncompliance with DOP 864 today, he could be convicted of the charge within days after that, and before any appeal could be processed or any prison administrator knew what was happening, Acoolla would be forced to serve yet another isolation sentence for wearing his hair long. Subsequent expungement of the disciplinary conviction would not compensate him for suffering the rigors of isolation time imposed in error. Therefore, in an abundance of caution, the court will grant Acoolla leave to reopen this case, without payment of filing fees, in the event that he is ever again charged during his present term of confinement with violating the grooming standards of DOP 864. An appropriate Final Order shall be issued this day.

Case 7:01-cv-01008-JCT   Document 182   Filed 09/01/06   Page 21 of 22   Pageid#: 745

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of the Final Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send certified copies of these Findings of Fact and Conclusions of Law and accompanying Final Order to plaintiff and to counsel of record for the defendants.

ENTER: This _____ day of September, 2006.

Senior United States District Judge